908 A.2d 684

WELLS FARGO BANK MINNESOTA, N.A., Trustee

v.

DIAMOND POINT PLAZA L.P. et al.

No. 1663, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Sept. 29, 2006.

Reconsideration Denied Dec. 7, 2006.

72

74

**76**

Jeff Joyce (Winstead, Sechrest & Minick, P.C., on the brief), Houston, TX, K. Donald Proctor, Margaret M. McKee, on the brief, Towson, for appellant.

Andrew H. Baida and Donald A. Rea (Gerard P. Martin, Shannon M. Chilchoate, C. William Clark, Robert L. Hanley, Jr., on the brief), Baltimore, for appellee.

Panel: MURPHY, C.J., DAVIS and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, J.

Appellant/cross-appellee Wells Fargo Bank, N.A. (Wells Fargo), in its role as trustee for the registered holders of the commercial mortgage backed securities for a loan held by appellee/cross-appellant Diamond Point Plaza Limited Partnership, *et al.* (Diamond Point), brought suit in the Circuit Court for Baltimore County against Diamond Point alleging breach of contract based on loan default, fraud and misrepresentation and conversion of funds. Wells Fargo also sued appellees/cross-appellants Sam's P.W., Inc. and Wal–Mart Stores, Inc. (Sam's and Wal–Mart, respectively), for various breaches of a lease agreement between landlord (Diamond Point) and tenant (Sam's).

Upon considering cross-motions for summary judgment from the parties, the court denied Diamond Point's motion but granted partial summary judgment in favor of Sam's, concluding that it did not violate a radius restriction contained in the lease and partial summary judgment in favor of Wells Fargo, finding that Sam's violated a retail use restriction. After the remaining issues were presented at a bench trial, the court ruled in favor of Wells Fargo and entered judgment against Diamond Point and Sam's, finding several breaches. The court also concluded that Wells Fargo did not satisfy its burden of proof to recover reasonable attorney's fees. Wells Fargo presents the following three issues for our review:

1. Whether the Circuit Court erroneously concluded that the seven mile radius restriction in the Sam's lease could not be violated in the absence of simultaneous operation of both the Diamond Point store and another store within the restricted area when the lease provided that, "Tenant agrees that it [and its Affiliates] shall not, during the term of this lease, own operate, manage or have any financial interest in, any store or business located within a radius of seven (7) miles from the

Shopping Center and similar to that then being conducted upon the demised premises;"

2. Whether the Circuit Court erroneously concluded that the default provisions of the Sam's lease under Article 20 did not provide for recovery of attorneys' fees by Wells Fargo against Sam's and Wal–Mart; and

3. Whether the Circuit Court erroneously concluded that Wells Fargo was not entitled to recover attorneys' fees or expenses from any of the [appellees/cross-appellants] under the contracts at issue because it failed to apportion its fees on a line-by-line basis as to every time entry on its bills.

Sam's and Wal–Mart responded by filing a cross-appeal, seeking our review of the following six questions:

1. Did the circuit court correctly conclude that the "radius restriction" in the subject lease was not violated absent the simultaneous operation of both the Diamond Point Plaza store and another store within the designated area?

2. Did the circuit court erroneously conclude that Appellant proved that The Wire's presence in the former Sam's Club space at Diamond Point Plaza proximately caused $1,250,000 in damages to the property?

3. Did the circuit court erroneously award $56,000 damages for violation of the "radius restriction" arising from a Sam's Club store located in Port Covington, Maryland[?]

4. Did the circuit court erroneously conclude that Wal–Mart is liable for breach of the subject lease to which it is not a party?

5. Did the circuit court correctly conclude that the default provisions of the subject lease do not permit Appellant to recover attorneys' fees against Sam's PW and Wal–Mart in the instant case?

6. Was any error in granting summary judgment on Appellant's attorneys' fee claim harmless inasmuch as Ap-

pellant failed to meet its burden of attributing reasonable and necessary fees to the claims against Sam's PW and Wal–Mart?

Diamond Point also filed a cross-appeal, presenting five questions for review:

1. Does carve-out liability for the full amount of the non-recourse loan at issue in this case exist for fraud, misrepresentation, or gross negligence when (a) the borrower disclosed information that forms the basis for the Circuit Court's judgment for recourse liability; (b) there is no evidence that the loan would not have been made or that its terms would have been any different but for the alleged misrepresentations; and (c) there is no evidence that Wells Fargo was even aware of the alleged misstatements, much less that it suffered any damages as a result of them?

2. Did the borrower have the right under the loan documents to keep rents that it collected prior to its default and the lender's assignee's demand?

3. Did the borrower commit "waste" by allegedly failing to maintain roofs it was given no notice or opportunity to repair, or by failing to commence litigation to prevent a tenant from violating a lease radius restriction when the violation lasted less than three months?

4. Did the Circuit Court otherwise err in awarding damages?

5. Did the Circuit Court properly deny Wells Fargo's request for attorneys' fees and expenses?

## FACTUAL AND PROCEDURAL BACKGROUND

Diamond Point and its affiliates [1] own and operate Diamond Point Plaza (the Center), a retail shopping center located in

---

1. The defendants at trial, who are now appellees/cross-appellants before this Court, include the Diamond Point Management Corporation, Oriole Commercial Associates Limited Partnership, Peerless Corporation, for-

eastern Baltimore County, which consists of three buildings containing space available for leasing to commercial tenants. Two of the largest tenants at the Center were Sam's Club, which executed an Assignment and Assumption of Lease on January 5, 1994, and Ames Department Store, which began its tenancy on April 13, 1989. In 2002, both stores closed or "went dark." The Sam's Club store closed on July 31, 2002 and, pursuant to its lease, continued to pay its base monthly rent. After filing for bankruptcy in August 2001 and announcing its decision to liquidate its "operations and to close all of the remaining Ames locations" in August 2002, the Ames store at the Center closed in late October of 2002. After Ames rejected the lease in bankruptcy court, it made no further rent payments.

In July of 1999, prior to the closing of the Sam's and Ames stores, Diamond Point and its affiliates sought to refinance the commercial loan on the Center because the original loan was scheduled to mature in January of 2000. Diamond Point submitted a refinancing application to Pinnacle Capital Group (Pinnacle), which was approved in June of 2000 in the amount of $15,300,000. At the loan closing, the loan and loan documents were assigned to Paine Webber Real Estate Securities, Inc. (Paine Webber), "which provided the funding to close the [l]oan." Wells Fargo became the assignee of the loan "by merger," resulting in the assignment of the "[n]ote, [m]ortgage, and all [l]oan [d]ocuments" to Wells Fargo as of August 15, 2000.

As a result of Ames' failure to pay rent to Diamond Point for November of 2002, Diamond Point failed to make its November 2002 loan payment to Wells Fargo. Wells Fargo initially filed suit on March 7, 2003 against Diamond Point, alleging breach of contract based on the loan default, fraud and/or misrepresentation in obtaining the refinancing loan and conversion of funds due and owing to Wells Fargo. Wells Fargo then amended its complaint on September 15, 2003 to

merly known as Konover Management Corporation, Michael Konover and American Way Commercial Associates Limited Partnership.

add breach of retail use restriction and radius restriction claims against Sam's and Wal–Mart. Subsequently, Wells Fargo filed a Third Amended Complaint on July 21, 2004, alleging the following in its complaint:

Diamond [Point] and its affiliates, agents or employees breached the contracts within the Loan Documents in numerous ways including the following:

a. By failing to disclose to Paine Webber and Wells Fargo what it and its affiliates knew prior to closing on the Loan with regard to Sam's intention to vacate the Property, in violation of its duties. . . .

b. By falsely affirming that it knew of no tenant's intention to vacate the Property when in fact it had specific knowledge of Sam's intention to vacate the Property, in violation of ¶ 21 of the Certificate;

c. By failing to disclose to Paine Webber and Wells Fargo attributes of the Property that could reasonably be expected to cause an institutional investor to regard the loan as an unacceptable investment and could affect the Loan's value and marketability, . . . ;

d. By failing to enforce the Lease provisions against Sam's when Sam's breached the Lease by owning, operating, managing or having a financial interest in any store or business within 7 miles of Diamond Point, . . . ;

e. By failing to enforce the Lease against Sam's and Wal–Mart when it/they sublet the Property to a non-retail tenant without notifying Diamond and obtaining its consent . . . ;

f. By committing waste upon the Property by not properly maintaining the roof and other structures, . . . ;

g. By failing to maintain its status as a Single Purpose Entity, . . . ; and

h. By wrongfully transferring, misappropriating or otherwise converting Rents after an Event of Default, . . . .

* * *

These breaches constitute fraud, intentional misrepresentation, gross negligence, willful misconduct, waste, misapplication, conversion and a violation of the single purpose entity requirement and therefore entitle Wells Fargo to full recourse against Diamond [Point] for all sums due under the Loan Documents and for damages.[2]

Regarding Wells Fargo's allegations of fraudulent conveyance, it contended:

It is believed and therefore averred that the $633,000 conveyance by Diamond [Point] to Michael Konover and/or to MCK after Diamond's default on its payment obligations to Wells Fargo was made when Diamond [Point] was legally insolvent or when such payment rendered Diamond [Point] insolvent, was made by Diamond [Point] without fair consideration, was made by Diamond [Point] with the knowledge of its insolvency and intent or belief that it would cause Diamond [Point] to incur or continue to incur debts beyond its ability to pay as they matured, and was made by Diamond [Point] with the intent to hinder, delay and de-

---

2. With respect to Konover Management Corporation, now known as Peerless Corp., Wells Fargo asserted:

Konover and its affiliates, agents or employees willfully, deliberately, and intentionally concealed and hid material facts which they had a duty to disclose, including but not limited to: the fact that Wal-Mart and/or its affiliate expressly informed Konover and/or its affiliate months before the Mortgage that Diamond Point Plaza anchor tenant, Sam's PW, intended to vacate the Diamond Point Plaza within one to two years and the fact that Diamond Point Plaza was a property which had an unpleasant odor during certain weather conditions because of its proximity to a sewage treatment facility, which odor could not be readily determined through reasonable inspections conducted at other times. Konover and its affiliates, agent or employees withheld these material facts, knowing (a) that Diamond [Point], its affiliate, would not have received the $15,300,000 loan for the Diamond Point Plaza, and (b) that [Wells Fargo] would not have agreed to an assignment of that Loan had the true facts not been actively concealed. There was justifiable reliance by [ ] Wells Fargo, upon the deceptive misrepresentations by Konover and its affiliates, agents or employees. As a result of Konover's fraud, misrepresentation, [ ] Wells Fargo, was induced to enter into an assignment of the Diamond Point Plaza Loan.

fraud its largest creditor, Wells Fargo, all in violation of the Maryland Uniform Fraudulent Conveyance Act ... and in violation of the Loan Documents. Michael Konover and/or MCK knew of Diamond [Point]'s insolvency and accepted the conveyance with the intention of further depleting Diamond [Point]'s assets to deprive Wells Fargo of the Rents to which it was rightfully owed. That $633,000 transfer was fraudulent as to Wells Fargo and Wells Fargo has been damaged as a result.

Wells Fargo's claims against Sam's and Wal–Mart included the following:

Wells Fargo's absolute assignment of all rights, titles and interests in the Lease and of all causes of action related to the Property entitles it to enforce those rights against all lessees at Diamond Point Plaza, including Sam's PW.

Sam's PW has breached the Lease in the following ways:

a. By assigning or allowing an assumption of the Lease to Sam's East and/or Wal–Mart, without notice to Diamond [Point]....;

b. By owning, operating, managing or having a financial interest in other stores within a 7 mile radius of Diamond Point Plaza, ...;

c. By permitting related entities, including Sam's East and Wal–Mart, to own, operate, manage and/or have a financial interest in other stores within a 7 mile radius, ...;

d. By allowing Wal–Mart to sublet the demised premises to The Wire without providing notice to Diamond [Point] ...; and

c. [sic] By allowing the demised premises to be used for a non-retail purpose....

\* \* \*

Although not a party to the Lease, Wal–Mart has assumed all of the liabilities under the Lease by virtue of its *de facto* assumption of the rights and liabilities under the Lease. As a result of that assumption, Wal–Mart is bound by the terms of the Lease to the same extent as Sam's PW.

Alternatively, Sam's made a constructive and non-gratuitous assignment of the Lease to Wal–Mart, insofar as Wal–Mart agreed to be liable for Sam's contractual obligations under the Lease and Sam's assigned all of its rights under the lease to Wal–Mart. As a result of that assignment, Wal–Mart is bound by the terms of the lease to the same extent as Sam's. Wal–Mart entered into the Wire License in October 2002.

The Wire License had an original term of one year. Wal–Mart, not Sam's, has extended the Wire License at least two times. Under the Wire License, Wal–Mart has the contractual right to receive payments from The Wire Productions, Inc. for its use and enjoyment of the leasehold premises. Wal–Mart has received payments from The Wire Production, Inc. for its use and enjoyment of the leasehold premises. Wal–Mart also has made payment to Wells Fargo under the Lease. Therefore, Wal–Mart has assumed all rights and liabilities under the Lease and is jointly and severally liable with Sam's PW for the breach of the Lease.

In any event, Wal–Mart was bound by the radius restriction when Sam's PW assumed the obligations under the Lease and agreed under ¶ 4(H) that neither it nor its affiliates would own, operate, manage or have a financial interest in a store within a 7 mile radius of Diamond Point. Sam's PW was expressly, impliedly and apparently authorized, by and through its common officers and employees, to contract and bind its affiliates, including Wal–Mart.

Wal–Mart furthermore expressly authorized, directed and actively joined with Sam's PW and Sam's East in committing the violations and breaches set forth herein. Wal–Mart is equally liable to Wells Fargo for those breaches. Those breaches and violations include, but are not limited to the following:

a. Improperly assuming and/or accepting an assignment of the Lease without notice to Diamond [Point] as required by ¶¶ 17(B) and 38(C);

b. Improperly entering into The Wire License for a portion of Sam's leasehold space, without notice to Diamond [Point]. . . .

c. Subletting the premises to The Wire for a use other than retail . . .; and

d. Owning, operating, managing or having a financial interest in another store within a 7 mile radius of Diamond Point Plaza. . . .

After considering the parties' cross-motions for summary judgment and hearing argument, in an Order filed January 10, 2005, the court issued the following ruling from the bench:

1. [Wells Fargo]'s Amended Motion for Partial Summary Judgment is granted in part and denied in part;

2. The Amended Motion for Summary Judgment filed by the Konover entities [Diamond Point] is denied;

3. The Cross Motion for Summary Judgment of the Wal–Mart entities [Sam's P.W., Inc. and Wal–Mart, Inc.] is granted in part and denied in part.

The Court finds the language of the lease at issue concerning the radius restriction to be unambiguous. As such, tenant Sam's agreed that it would not:

. . . During the term of this lease, own, operate, manage or have any financial interest in, any store or business located within a radius of seven (7) miles from the Shopping Center and similar to that then being conducted upon the demised premises.

Sam's closed its store on one day; and as a result, no store business was being conducted upon the demised premises the next day. On that next day, Sam's opened its store at Golden Ring Mall.

[Wells Fargo] argues that Sam's violated the radius restriction slightly more than two years prior to the opening of the location at Golden Ring Mall when Sam's first acquired a "financial interest" in Golden Ring Mall by entering into a letter of intent for a ground lease at that location.

The Wal–Mart entities argue that there was no violation of the radius restriction as the lease permitted Sam's to close at any time, and by closing, the radius restriction was no longer applicable. The fact that Sam's had employees and inventory at the Golden Ring Mall location prior to the Diamond Point location going dark does not violate the radius restriction. Furthermore, if Sam's employees and inventory at the Diamond Point location once it had gone dark and the Golden Ring Mall location had opened, that too did not violate the radius restriction.

For the radius restriction to have been violated, the Sam's at both the Diamond Point location and the Golden Ring Mall location would have had to be open at the same time. The language of the radius restriction is unambiguous in that it requires both stores to be operating simultaneously. Therefore, unless the doors of both locations were open for business and customers were being served simultaneously, then and only then would the radius restriction have been violated.

Similarly, the language concerning use of the demised premises is also unambiguous. So long as the tenant is open for business, "the demised premises shall only be used for lawful retail and shopping center purposes . . .". The sublease to The Wire violated this use provision in the lease despite the Wal–Mart Entities' argument that the restriction applies only to the tenant's own operations of the premises.

The case proceeded to trial on April 4, 2005. After reviewing the parties' submitted Proposed Findings of Facts and Conclusions of Law, the court issued its Findings of Fact and Conclusions of Law on August 15, 2005. The court's findings were amended in an Order dated August 24, 2005, in which the court ruled that the language in Sam's rental lease "[did] not entitle Wells Fargo to attorneys' fees in this case," and that Sam's and Wal–Mart were jointly and severally liable for $1,250,000.00 and $56,260.86 in damages as a result of violating the retail use and radius restrictions contained in its lease.

The court also reiterated its conclusion that Wells Fargo was not "entitled to its reasonable and necessary attorneys' fees in enforcing the Loan Documents." At the conclusion of the two-day hearing regarding Wells Fargo's request for attorney's fees, the court denied its request, reasoning:

... I'm just not persuaded, so it is my intention to vacate that part of the partial judgment which says that [Wells Fargo] is entitled to attorney fees from Wal–Mart and Sams and to revise the finding of fact and conclusions in those respects as well.

\* \* \*

All right. In addition, even if I weren't making that finding, and I guess that is an alternative finding, I don't think that [Wells Fargo] has met its burden of proof by the preponderance of the evidence regarding the fees that it seeks from Wal–Mart and Sams or from the Konover [and Diamond Point] Defendants.

[Wells Fargo has] to meet [its] burden of proof by a preponderance of the evidence that the fees are necessary and reasonable. I've considered the factors in Rule 1.5, the Court's own two decades of experience in commercial litigation such as this case, experience in presiding over other trials in which attorney fees are at issue, and the record in this case.

Um, there is no question that [Wells Fargo] attorneys have significant experience and solid reputation in commercial litigation. And the many papers filed in the case, the oral arguments at the hearings and presentation at trial and performance at trial demonstrate their excellent skills, and that is true of each of the four attorneys representing [Wells Fargo] that appeared in this Court.

I don't dispute that this litigation has been complex compared to most of the other cases tried in this Court. I think that the hourly rates charged by [Wells Fargo's] lawyers reflect that high level of skill that was required and necessary to present [Wells Fargo's] claims. . . .

The hourly rates charged by each of [Wells Fargo's] attorneys and their paralegals I would find are reasonable and consistent with or below the market in this region. And I do appreciate the efficiency of the manner in which [Wells Fargo's] request for fees have been presented. I don't think any other method would have been as inexpensive for clients and the Defendants from whom the fees are sought, and no other method suggested at this hearing would have been as efficient in terms of the Court's time and resources.

I think that the so-called Adelberg discount of 15 percent was an appropriate measure of the duplicating incurred by substituting the Proctor law firm for the Adelberg law firm. But I don't believe it is possible that fees are reasonable and necessary without undertaking a line-by-line analysis of each legal bill. Most reluctantly, I don't believe that is possible.

I also don't believe it is possible to find that fees are reasonable and necessary where the description of services has been redacted.

Perhaps it was good trial strategy to have more than one attorney see certain witnesses testify at deposition, and that may have been good trial preparation, but I don't think that I could find it was necessary to have more than one lawyer at any of the depositions, particularly depositions being defended.

Nor do I think it would be fair to recover fees for more than one lawyer at deposition and at many of the hearings that were held in this case.

From the Konover [and Diamond Point] defendants in this case Mr. Clark has appeared for most part alone at hearings, although at trial he did have other counsel, one other attorney appeared with him, and he was alone at the deposition.

I also don't think it would be fair and to recover fees for paralegals at the trial or at depositions.

Further, I wouldn't find it reasonable or fair to collect from the debtor, under the circumstances of the case, secretarial overtime or charges for faxes or for meals of the lawyers or others involved in this case.

Although the defendants have only pointed out some examples of fees which it would not be reasonable or fair, which clearly were not necessary, such as the expense for travel to South Carolina or Mr. Joyce's travel to Minnesota, which was not really explained. The inclusion of those time entries highlights the problems with [Wells Fargo] not undertaking a line-by-line analysis.

Without having the case presented that way, although I have looked at many, many pages of these legal bills and looked at a number of individual entries, it is impossible for the Court to determine from looking at them that way whether or not the apportionment would be fair between the time and resources expended for claims against Wal–Mart and Sams as opposed to the claims against the Konover or Diamond Point defendants.

I think that's it.

The court filed its Amended Final Judgment Order on December 5, 2005:

1. Judgment in favor of [appellant], Wells Fargo Bank, N.A., as Trustee, is hereby entered against [appellees/cross-appellants], Diamond Point Plaza Limited Partnership, Oriole Commercial Associates Limited Partnership and Diamond Point Management Corporation for breach of ¶ 55(A) and (B) of the Mortgage for intentional misrepresentation and gross negligence and against . . . Konover Management Corporation, now known as Peerless Corp., for breach of the Guaranty of Recourse Obligations, under Counts 1, 2, 3 and 4 of the Third Amended Complaint, in the amount of $22,862,399.66 . . . (representing the total note indebtedness owing as of April 4, 2005) together with pre-judgment interest thereon at the rate of $5,799.51 per day from April 5, 2005, of $811,931.40, and post-judgment interest from the

date of entry of Final Judgment until finally paid. This judgment is entered jointly and severally. . . .

2. Judgment in favor of [appellant], Wells Fargo Bank, N.A., as Trustee, is hereby entered against [appellees/cross-appellants], Sam's P.W., Inc. and Wal–Mart Stores, Inc., for breach of the 7 mile radius restriction of the Lease in the opening of the Port Covington Sam's store, under Counts 7 and 10 of the Third Amended Complaint, in the amount of $56,260 . . . and post-judgment interest from the date of entry to Final Judgment until finally paid. This judgment is entered jointly and severally. . . .

3. Judgment in favor of [appellant], Wells Fargo Bank, N.A., as Trustee, is hereby entered, jointly and severally, against [appellees/cross-appellants], Sam's P.W., Inc. and Wal–Mart Stores, Inc., under Counts 7 and 10 of the Third Amended Complaint, in the amount of $1,250,000 . . . for breach of the retail use restriction of the Lease, and post-judgment interest from the date of the entry to Final Judgment until finally paid.

4. Judgment in favor of [appellant], Wells Fargo Bank, N.A., as Trustee, is hereby entered against [appellees/cross-appellants], Diamond Point Plaza Limited Partnership, Oriole Commercial Associates Limited Partnership and Diamond Point Management Corporation for breach of ¶ 55(F)(misapplication of rents) and ¶ 55(I)(single purpose entity) of the Mortgage and against . . . Konover Management Corporation now known as Peerless Corp., for breach of the Guaranty of Recourse Obligations, under Counts 1, 2, 3 and 4 of the Third Amended Complaint, in the amount of $633,000 . . . together with pre-judgment interest thereon from November 22, 2002, of $104,466.20, and post-judgment interest from the date of entry of Final Judgment until finally paid. This judgment is entered jointly and severally. . . .

5. Judgment in favor of [appellant], Wells Fargo Bank, N.A., as Trustee, is hereby entered against . . . Michael C. Konover, for fraudulent transfer, under Count 6 of the Third Amended Complaint, in the amount of $633,000 . . .

together with pre-judgment interest from November 22, 2002, of $104,466.20, and post-judgment interest from the date of entry of Final Judgment until finally paid.

6. Judgment in favor of [appellant] Wells Fargo Bank, N.A., as Trustee, is hereby entered against ... American Way Commercial Associates Limited Partnership, for fraudulent transfer, under Count 6 of the Third Amended Complaint, in the amount of $243,500 ... together with pre-judgment interest thereon from November 22, 2002, of $40,190.12, and post-judgment interest from the date of entry of Final Judgment until finally paid. This judgment is entered jointly and severally with the judgment entered in paragraph 5 hereof.

7. It is further ORDERED that the judgment awarded in paragraph 1 hereof shall be credited with the proceeds of any Trustee's foreclosure sale which may be conducted with respect to the Diamond Point Plaza property securing the Diamond Point Plaza Limited Partnership indebtedness made the subject of this action.

\* \* \*

9. It is further ORDERED that for the reasons stated on the record on August 24, 2005, [appellant] [Wells Fargo] is not entitled to recover reasonable and necessary attorneys' fees incurred in connection with pursuing its claims for judgment against [appellees/cross-appellants], Sam's P.W., Inc., and Wal–Mart Stores, Inc. pursuant to the Lease.

10. It is further ORDERED that for the reasons stated on the record on August 24, 2005, [appellant][Wells Fargo], has not met its burden of proof for its claims to recover reasonable and necessary attorneys' fees incurred in connection with pursuing its claims for judgments against ... Diamond Point Plaza Limited Partnership, Konover Management Corporation now known as Peerless Corp., Oriole Commercial Associates Limited Partnership, and Diamond Point Management Corporation pursuant to the Diamond Point Plaza Limited Partnership Promissory Note and re-

lated loan documents, and alternatively to No. 9 above, against ... Sam's P.W., Inc. and Wal–Mart Stores, Inc.

11. As requested, the Court will reserve judgment on [Wells Fargo's] legal fees and expenses incurred in the (inevitable) appeals.

The court denied Wells Fargo's Motion to Alter or Amend the judgment denying the award of attorney's fees. Each party filed notices of appeal and amended notices of appeal after each judgment and amended judgment entered by the court. Wells Fargo seeks review of the court's partial summary judgment order concerning the Sam's radius restriction and the court's judgment rejecting Wells Fargo's claim for counsel fees and expenses. Sam's and Wal–Mart are challenging the court's damages award against them relating to the retail use and radius restriction violations. In Diamond Point's cross-appeal, it contends that all judgments against it should be reversed.

## LEGAL ANALYSIS

### I

### Wells Fargo's Appeal

Wells Fargo asserts that the court erroneously granted Sam's motion for summary judgment because Sam's violated the radius restriction contained in its lease when it opened another location at Golden Ring Mall, which was located within seven miles from the Diamond Point store after the Diamond Point location went dark. In its brief, Wells Fargo argues that the

> plain and unambiguous meaning of this provision of the lease is that the Sam's/Wal–Mart defendants cannot own, operate or have a financial interest in any other stores within 7 miles of the Diamond Point store at any time during the term of the lease. To interpret the lease any other way renders the language of the radius restriction surplusage and utterly defeats the purpose of the radius restriction.

## Radius Restriction

In accordance with Maryland Rule 2–501(a)

Any party may make a motion for summary judgment on all or part of an action on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law. The motion shall be supported by affidavit if it is (1) filed before the day on which the adverse party's initial pleading or motion is filed or (2) based on facts not contained in the record.

Pursuant to Maryland Rule 2–501(f), a trial court

shall enter judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law.

An appellate court's review of the trial court's grant of summary judgment involves the determination of whether a dispute of material fact exists and whether the trial court was legally correct. *Redland Genstar, Inc. v. Mahase*, 155 Md. App. 72, 77, 841 A.2d 413 (2004). Upon review of an order granting a motion for summary judgment, appellate courts "must determine whether the trial court was legally correct" because the trial court decided an issue of law, not fact. *Maryland Cas. Co., et al. v. Lorkovic*, 100 Md.App. 333, 354, 641 A.2d 924 (1994)(citing *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993)). *Accord, B.G.E. v. Lane*, 338 Md. 34, 43, 656 A.2d 307 (1995)(*overruled on other grounds* ). We review the same material from the record and decide the same legal issues as the trial court. *Winmark Ltd. P'ship. v. Miles & Stockbridge*, 109 Md.App. 149, 674 A.2d 73 (1996)(judgment vacated on other grounds). Because we decide the same issues of law as the trial court and have the same information from the record, our review of a trial court's grant of summary judgment is *de novo. ABC Imaging of Wash. v. Travelers Indem. Co. of Am.*, 150 Md.App. 390, 397, 820 A.2d 628 (2003). As a threshold issue, we must first decide whether a genuine dispute of material fact exists. *de la*

*Puente, et al. v. County Comm'rs of Frederick County,* 386 Md. 505, 510, 873 A.2d 366 (2005). Only if such a dispute is absent will we proceed to review determinations of law and examine the facts reflected in the pleadings, depositions, answers to interrogatories and affidavits that were properly brought before the court and any reasonable inferences that may be drawn from them construed in the light most favorable to the non-moving parties. *Id.* (citations omitted). *See also Sadler v. Dimensions Healthcare Corp.,* 378 Md. 509, 533, 836 A.2d 655 (2003); *Remsburg v. Montgomery,* 376 Md. 568, 579–80, 831 A.2d 18 (2003).

"Mere speculation as to the possible existence of a factual dispute will not defeat a motion for summary judgment." *A.J. Decoster Co. et al. v. Westinghouse Elec. Corp.,* 333 Md. 245, 262, 634 A.2d 1330 (1994) (citation omitted). In contradistinction to the duty of the party moving for summary judgment to carry his burden, the party in opposition " 'must do more than simply show there is some metaphysical doubt as to the material facts.' " *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

In the case at hand, the parties filed cross motions for summary judgment.

The lease provisions at issue, which pertain to the radius restriction, are listed under the Annual Rent subheading on the lease and provide as follows:

4. (G) Subject to the other provisions of this lease, Tenant shall have the right to determine how any store on the demised premises is to be operated, and to discontinue the operation of any such store, and to operate stores in other locations which are in competition with any such store. Subject to the other provisions of this lease (i) Tenant reserves the right to operate its business whether on the demised premises, or elsewhere, as it sees fit, and (ii) Landlord shall have no express or implied right to interfere in the operation of Tenant's business, or complain about or hold Tenant liable for the manner in which Tenant's busi-

ness is conducted. Nothing contained in this Article 4 shall be deemed to express or imply any obligation on the part of Tenant to operate the demised premises in such a manner as to achieve Gross Sales sufficient to generate Percentage Rent.

(H) *Tenant agrees that it shall not, during the term of this lease, own, operate, manage or have any financial interest in, any store or business located within a radius of seven (7) miles from the Shopping Center and similar to that then being conducted upon the demised premises.* It shall also be a default hereunder if any "Affiliate" (hereinafter defined) or any partner, officer, director or stockholder of Tenant shall, during the term of this lease, own, operate, manage or have any financial interest in, any store or business located within the aforementioned radius and similar to that then being conducted upon the demised premises. . . . "Affiliate" means any person, firm or corporation which controls or is controlled by the party in question, or is controlled by the same person(s) or firm(s) or corporation(s) as control the party in question. The term "control" with respect to a corporation means the ownership of, and the right to exercise, more than fifty percent (50%) of the total combined voting power of all classes of the capital stock of the controlled corporation issued, outstanding and entitled to vote for the election of directors, whether such ownership be direct or indirect through control of another corporation(s) or firm(s). . . .

(Emphasis added.)

■ Wells Fargo asserts that the court erroneously granted Sam's motion for summary judgment because Sam's violated the radius restriction contained in its lease when it opened another location at Golden Ring Mall, which was located within seven miles from the Diamond Point store after the Diamond Point location went dark.

Wells Fargo's interpretation of the lease restriction in provision (H) is that "the phrase 'then being conducted on the demised premises' unambiguously refers to the earlier phrase

in the radius restriction clause, 'during the term of this lease.' " Wells Fargo contends that "[t]he language 'then being conducted on the demised premises' does not refer to specific moment in time," and interprets the circuit court's decision as concluding precisely that. Wells Fargo maintains rather that the language refers to a "continuum in time" versus a specific moment, "that being the time during which the lease is in effect, *i.e.*, the term of the lease." In Wells Fargo's view, such an interpretation limits Diamond Point from circumventing the radius restriction by simply closing one store and opening another "down the street." The provision prohibits not only simultaneous operations, but all operations within the restricted area. Thus, the circuit court's interpretation in Wells Fargo's view renders the clause illusory and gives it a meaning not possibly intended by the parties.

In its reply brief, Well's Fargo dismisses the interpretation of the clause to mean no "competing" stores can be in the seven mile radius as Sam's having done "what it declares to be forbidden by the rules of contract construction." In support, Wells Fargo cites paragraph 4(G) *supra* and highlights language stating "tenant shall have the right ... to operate stores in other locations which are in competition with any such store." The lease does not contain the word compete or competing.

Wells Fargo further states that Sam's interpretation renders the phrase "during the term of this lease" meaningless and nonsensical because Sam's assigns the same meaning to it and the phrase "then being conducted." When the term of the lease expires, there is "no business being conducted" that could be similar to any business in the restricted area. Wells Fargo asserts that the phrase "during the term of the lease" must be read to modify "then being conducted upon the demised premises." Thus, the word "then" modifies the phrase "the term of the lease."

Counsel for Wells Fargo, at oral argument posited that there are three possible outcomes. One is summary judgment for Wells Fargo; two is affirming the trial court's decision;

and three is for the Court to find ambiguity and remand for further proceedings.

The pivotal point of contention is the word "then." It is the position of Wells Fargo that "then" refers to *"at any time during the term of the lease,"* and not to a specific moment in time as the trial court "seemingly concluded." The time period referred to by "then being conducted on the demised premises," according to Wells Fargo, is unambiguous. It refers to a continuum of time which is the time "during which the lease is in effect", i.e. "the term of the lease."

Sam's agrees with Wells Fargo and the court, that the language of the lease is clear and unambiguous. Sam's posits that the "provisions at issue should be interpreted as a matter of law." The lease was negotiated fifteen years prior and, thus, according to Sam's at oral argument, there is no parol evidence that could shed light on the intent of the parties. If the Court remands the case for further proceedings, according to Sam's, there are no witnesses or evidence. Thus, an objective interpretation of the four corners of the document is the only way to interpret the language and Sam's position.

Sam's contends that Wells Fargo "misinterprets the radius restriction by reading express language out of the lease and out of context." Sam's interprets Wells Fargo's construction as ignoring the language "then being conducted on the premises." Sam's focuses on the provision stating that the tenant shall not operate "any store or business located within a radius of seven (7) miles from the Shopping Center *and similar to that then being conducted upon the premises."* (Emphasis in brief.) Sam's contends that the restriction has two parts that must be considered: "(1) that the allegedly offending store is within seven miles of the demised premises; and (2) it must conduct a business similar to that then being conducted on the demised premises." Thus, according to Sam's, "[i]f there is no business then being conducted on the demised premises, then another store within seven miles would not violate the second requirement of the restriction." Sam's concludes that, given its interpretation, Wells Fargo

would render the second requirement "superfluous" because a tenant would be in breach of a twenty-year lease if it opened another store within seven miles regardless of whether there was any business was being conducted on the demised premises.

The circuit court's interpretation of the restriction did not, in Sam's view, ignore the rules of contract construction because it simply read the plain language in the lease "harmoniously" such that the words created a requirement that two "competing" stores be operating simultaneously. According to Sam's, that is a plain reading of the language in the lease.

Sam's next contention is that Wells Fargo's interpretation requires the court to ignore the fact that the language is "part of the Annual Rent provisions regarding percentage rent." Thus, read in context, Sam's contends that the restriction is to protect the opportunity for rental percentage collection while the "Diamond Point store is open and operating." Another store opened in the radius would affect rental payments because it would necessarily detract from business and undermine the annual sales. Sam's concludes that, once the Diamond Point Store closed, the point became moot because there was no competing enterprise within the radius. Sam's also posits that this argument renders Wells Fargo's concern regarding circumvention of the clause and its being illusory and without merit because, "[s]o long as the store is operating, the clause remains in effect."

Sam's cites the Court of Appeals for the proposition that the closing of the store was a "defined event in the future" that rendered the contractual clause here moot. *Ledingham v. Bayless*, 218 Md. 108, 116, 145 A.2d 434 (1958); *Tyler v. Capitol Indem. Ins. Co.*, 206 Md. 129, 137, 110 A.2d 528 (1955).

Finally, Sam's disregards Well Fargo's assertion that the court ignored the phrase "during the term of this lease" because, as defined, it means the original term of the lease so long as the lease remains in effect. "Concomitantly, the phrase [ ] means only that the radius restriction cannot extend beyond the initial term of the lease" or its termination.

It is well-settled that in regard to contract construction principles,

> Contracts are interpreted "as a whole to determine the parties' intentions." Ordinarily, the terms of a contract are construed consistent with their usual meaning, unless it is apparent that the parties ascribed a special or technical meaning to them.
>
> In ascertaining the parties' intent, Maryland follows the objective law of contract interpretation. Thus, the court is required to "give effect to [the contract's] plain meaning," without regard to what the parties to the contract thought it meant or intended it to mean. Generally, " 'it must be presumed that the parties meant what they expressed.' " Therefore, the " 'true test of what is meant is ... what a reasonable person in the position of the parties would have thought' the contract meant." " 'If only one reasonable meaning can be ascribed to the [contract] when viewed in context, that meaning necessarily reflects the parties' intent.' " In addition, "the parties to an agreement are deemed to have contracted with knowledge of existing law...."
>
> When a contract is clear and unambiguous, " 'its construction is for the court to determine.' " Whether a contract is ambiguous is a question of law, which is subject to *de novo* review by an appellate court. Contractual language is considered ambiguous when the words in it are susceptible of more than one meaning to a reasonably prudent person. A contract is not ambiguous, however, merely because the parties to it do not agree as to its meaning.

*Young v. Anne Arundel County,* 146 Md.App. 526, 585–87, 807 A.2d 651, *cert. denied,* 372 Md. 432, 813 A.2d 259 (2002)(internal and external citations omitted). *See also Nat'l Union Fire Ins. Co. of Pittsburgh v. David A. Bramble, Inc.,* 388 Md. 195, 879 A.2d 101 (2005)(applying contract interpretation principles to surety bonds).

We have considered the constructions offered by both parties and, finding both interpretations to be reasonable, we

shall refer the matter to the circuit court to consider any extrinsic matters which will provide context for a proper determination of what the parties intended.

The court granted judgment to Sam's and Wal–Mart as a matter of law finding that the restriction language listed in subsection (H) was unambiguous. The trial judge construed the language creating the restriction to mean that, "unless the doors of both [Diamond Point and Golden Ring Mall] locations were open for business and customers were being served simultaneously, then and only then would the radius restriction have been violated." Contrary to the construction accorded by the court, as we see it, the lease is ambiguous and Sam's was not entitled to summary judgment because there remain genuine disputes as to material facts in regard to whether the opening or closing of a store constituted a violation of the restriction.

A lease contract, like any other contract, "is measured by its terms unless a statute, a regulation, or a public policy is violated thereby." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985) (citations omitted). The instrument is construed as a whole to determine the intention of the parties, which is the entire reason for the analysis. *Id.* (and citations within). The trial court should examine the "character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Id.* (and citations within). Words are accorded their ordinary and accepted meanings as a reasonable prudent layperson would attach to them. *Id.*

The *Pacific Indemnity* Court cited illustrations of both ambiguous and unambiguous contract terms. *Id.* at 389, 488 A.2d 486. Ambiguous terms included the meaning of "occurrence," and the meaning of "collapse." *Id.* at 389–90, 488 A.2d 486. Unambiguous terms included the meaning of "loan" and the meaning of "loss by infidelity of an . . . employee." *Id.* at 390, 488 A.2d 486. The inquiry is initially confined to an analysis of the language used and, if unambiguous, courts may construe contracts as a matter of law. *Id.* at 389, 488 A.2d

486. If the language is ambiguous, then the court may consult extrinsic evidence to determine the parties' intentions. *Id.* If in its weighing of extrinsic evidence, the court finds disputed factual issues, the construction of the contract is for the fact finder. *Id.* Even if there are no disputed facts, the court may construe an ambiguous contract. *Id.*

That the Diamond Point Sam's store went dark and did not serve customers, while the Golden Ring store, located within seven miles, remained open for business are facts that are material, we believe, relative to whether there was a breach. The court found that, under the lease, the two locations would have to be fully operational to invoke the radius restriction. It was also established that Sam's is an active tenant at both locations. The lease gave Sam's the right to "determine how any store on the demised premises is to be operated, and to discontinue the operation of any such store," but that right, and the fact that Sam's took advantage of that right, is not inconsistent with the conclusion, by a rational fact-finder, that Sam's maintenance of a presence at both locations, under the lease, constituted a violation of the radius restriction which provides that Sam's should not "own, operate, manage or have any financial interest" in any store within a seven mile radius "similar to that then being conducted upon the demised premises." In other words, a dispute existed as to the material fact as to whether maintenance of a presence at both locations constituted ownership, etc. in any store similar to that being conducted. Wells Fargo, in our view, presented sufficient facts to demonstrate ambiguity as to whether a breach only occurred if there were competing businesses at the two locations. Operating or managing competing stores would not prevent the ownership or financial interest in those stores. Sam's cross-motion for summary judgment, therefore, should have been denied and the issue submitted to the trier of fact for determination. We are thus constrained to reverse the court's entry of summary judgment on the radius restriction issue and remand the case for proceedings to allow extrinsic evidence as to the meaning of "then" and resolve the ambiguity.

### b. Attorney's Fees Under the Sam's Lease

■■■ Upon considering a request for attorney's fees, Maryland courts adhere to the "American Rule," which states that "attorney's fees are ordinarily not recoverable by a prevailing party in a lawsuit ... '[t]he general rule is that costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for [compensatory] damages.' " *Hess Constr. Co. v. Bd. of Educ. of Prince George's County,* 341 Md. 155, 159, 669 A.2d 1352 (1996) (citations omitted; alterations in original). We have previously noted that "[t]his is true whether the action seeking fees sounds in contract or tort." *Chang v. Brethren Mut. Ins. Co.,* 168 Md.App. 534, 552, 897 A.2d 854 (2006). In some instances, "a trial court may award attorneys' fees only in the unusual situation where the trial court is authorized to award the prevailing litigant reasonable attorneys' fees or where, as more common, a contract between the parties specifically authorizes attorneys' fees." *Maxima Corp. v. 6933 Arlington Development Ltd. P'ship,* 100 Md.App. 441, 452, 641 A.2d 977 (1994) (citation omitted). *See Chang,* 168 Md.App. at 552, 897 A.2d 854 (explaining "[a]n exception to that general rule is when an action is brought to enforce an insurer's obligations under third party liability provisions in a policy, and it is determined that there is coverage.") (citation omitted). Notably, "the question of attorneys' fees is a factual matter which lies within the 'sound discretion of the trial judge and will not be overturned unless clearly erroneous.' " *Maxima Corp.,* 100 Md.App. at 452, 641 A.2d 977 (citations omitted).

■■■ Wells Fargo argues that the court erroneously denied its request for attorney's fees in its litigation against Sam's for lease violations despite the provision in the lease that Sam's was to be responsible for such fees in case of default. The default provisions of the lease provide, in pertinent part:

20. (A) If (i) Tenant shall default in the payment of any rent or sum of money payable by Tenant to Landlord and if Tenant shall fail to cure said default within ten (10) days after receipt of notice of such default from Landlord, or (ii)

*Tenant shall default in the performance or observance of any other agreement or condition on its part to be performed or observed and if Tenant shall fail to cure such default* ...; Landlord in addition to all other remedies given to Landlord in law or in equity may terminate this lease, or without terminating this lease, terminate Tenant's right of possession, and in either event Landlord may re-enter the demised premised by lawful proceedings and dispossess the Tenant.

(B) Tenant agrees to be liable for all rent and other charges and sums due under this lease for the entire term, which liability shall survive the termination of this lease, the re-entry into the demised premises by Landlord, and the commencement of any action to secure possession of the demised premises. *Landlord shall have the right to maintain successive actions against Tenant for recovery of all damages including, without limitation, said lost rental and other charges and sums, and any expenses incurred by Landlord in connection with obtaining possession of the demised premises and in connection with any reletting, including, without limitation, reasonable attorneys' fees* and brokers' fees,.... Notwithstanding anything contained herein to the contrary, Landlord shall have all other rights and remedies available to it at law and in equity.

\* \* \*

(D) All remedies available to Landlord are declared to be cumulative and concurrent, and may be exercised at one time or at different times. *In all events, Tenant shall be liable for all reasonable attorneys' fees Landlord incurs in exercising its remedies under this Article 20, whether or not litigation is instituted.*

(Emphasis added.)

The court, although having initially denied Sam's motion for summary judgment on this issue, later vacated that judgment and adopted Sam's argument that attorney's fees are generally not awarded. More specifically, it concluded that, when

subsections (B) and (D) of the lease were read together, Wells Fargo could only receive attorney's fees when it attempted to "obtain possession of the demised premises" after default. Because Wells Fargo did not seek to re-enter the premises at the Diamond Point Sam's store, these provisions are inapplicable. We disagree.

The reasonable attorney's fees referenced in subsection (B) discuss Sam's liability for such fees after default and the right of the landlord, or Wells Fargo to be substituted in the position of the landlord and to seek counsel fees "in connection with obtaining possession of the demised premises and in connection with any reletting." The general rule that bars attorney's fees can be altered with the specific language contained in the lease. It is apparent that Wells Fargo intended to expressly provide for the collection of attorney's fees.

The statement within the lease noting that the tenant would be liable for all reasonable attorney's fees comports with the well-settled rule that, under the American Rule, attorney's fees and expenses cannot be recovered by the prevailing party in an action, unless the specific contract provisions such as the lease in the case at bar, permit such recovery. As a result, we are satisfied that the court erred in ruling that Sam's was not liable for attorney's fees. Wells Fargo directs the Court to section 20(D) of the lease for the proposition that Sam's is liable for all reasonable attorneys' fees that Wells Fargo incurs in exercising its remedies under the default section of the lease. We agree. Contrary to Sam's assertion, section 20(D) does not subsume 20(A). It is a remedy for Wells Fargo under the Default provision of the lease.

### c. Attorney's Fees from Sam's/Wal–Mart and Diamond Point

■ After conducting an evidentiary hearing to consider Wells Fargo's request for attorney's fees, the court vacated a prior judgment and granted summary judgment to Sam's and Wal–Mart, ruling that they were not liable for attorney's fees. The court also found that Diamond Point was not liable for

attorney's fees. Wells Fargo assigns error to these judgments. We disagree with the court's ruling.

An action tried below without a jury will be reviewed "on both the law and the evidence." Md. Rule 8–131(c) (2006). Pursuant to Rule 8–131(c), we "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *Id.*

In *Maxima Corp., supra,* we explained:

In circumstances in which attorneys' fees are awarded based on a contractual right, the losing party is "entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages." *Bankers [and Shippers Ins. Co. of N.Y. v. Electro Enters., Inc.],* 287 Md. [641] at 661, 415 A.2d 278 [ (1980) ]. In *Bankers,* the Court of Appeals reversed the trial court's award of only 30 percent of the total attorneys' fees sought. The Court remarked that:

the informal hearing conducted by the trial court neither required any real proof of the amount of the fees and expenses claimed *nor provided Bankers with a realistic opportunity to challenge those fees and expenses....* Instead, the parties merely submitted, prior to the hearing, informal fee and expense petitions and made short, oral representations at the hearing of the amounts claimed. On remand, there should be a proper trial regarding the damages incurred....

*Id.* at 661–62, 415 A.2d 278.

Other jurisdictions have delineated the detail required and the quantum of information that the prevailing party must provide. The overwhelming authority holds that (a) the party seeking the fees, whether for him/herself or on behalf of a client, always bears the burden of presenting evidence sufficient for a trial court to render a judgment as to their reasonableness; (b) an appropriate fee is always reasonable charges for the services rendered; (c) a fee is not justified by a mere compilation of hours multiplied by

fixed hourly rates or bills issued to the client; (d) *a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged;* (e) it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; (f) without such records, the reasonableness, *vel non,* of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence. *Kaiser v. MEPC American Properties, Inc.,* 164 Ill.App.3d 978, 115 Ill.Dec. 899, 902–03, 518 N.E.2d 424, 427–28 (1987) (collecting Illinois case law for the foregoing propositions). *Accord Kinsey v. Preeson,* 746 P.2d 542, 552 (Col.[Colo.]1987) (trial court's findings regarding award of attorneys' fees were insufficient where determination of reasonableness was based on an affidavit submitted after trial and no opportunity was provided to challenge the affidavit); *Sperber v. Penn Cent. Corp.,* 150 A.D.2d 356, 540 N.Y.S.2d 877, 878 (1989) (absent evidence regarding specifics as to the time and labor required, the record was insufficient to determine reasonable attorneys' fees); *see also Bosch Die Casting, Co. v. Lunt Mfg. Co.,* 236 Ill.App.3d 18, 177 Ill.Dec. 476, 482–83, 603 N.E.2d 546, 552–53 (Ill.App.Ct.1992).

Once presented with these facts, the trial court must still evaluate the reasonableness of the fees. Again, the burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees. Maryland courts consider a variety of factors including, but not limited to, those delineated in Md.Rule 1.5. Those factors are:

"(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

"(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

"(3) the fee customarily charged in the locality for similar legal services;

"(4) the amount involved and the results obtained;

"(5) the time limitations imposed by the client or by the circumstances;

"(6) the nature and length of the professional relationship with the client;

"(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

"(8) whether the fee is fixed or contingent."

*Maxima Corp.*, 100 Md.App. at 453–55, 641 A.2d 977 (footnote omitted)(emphasis in original).

Wells Fargo presented testimonial and documentary evidence of its attorney's fees in litigation against Sam's, Wal–Mart and Diamond Point. Its lead counsel testified that the bills showed allocations of expenses to cross-appellants, while also explaining that, during the organization of the bills, Wells Fargo decided not to present a line-by-line analysis of each time and expense entry. At oral argument before a panel of this Court, Wells Fargo's counsel intimated that it would require 8,000 opinions and judgment calls whether the charges were to Sam's or Diamond Point because they are not "black and white." Wells Fargo's counsel would be required to go through the billings to make such a determination because there are multiple parties. Counsel for Wells Fargo reasoned that a line-by-line analysis would have been too time-consuming and costly. The court, however, found it "impossible" to fully consider Wells Fargo's fee request without a line-by-line analysis and, therefore, denied counsel fees. Although Wells Fargo failed to properly provide a line-by-line itemization in its billing submitted to the court, the proper remedy is not for the court to deny all of the counsel fees requested.

The complexity of this case is evident. Wells Fargo has successfully argued that the Diamond Point entities, Sam's Club and Wal–Mart have committed breaches of the subject lease and mortgage agreements. Counsel for Wells Fargo brought suit against the cross-appellants based upon several

legal principles—breach of contract, fraud, misrepresentation and waste—and spent considerable time in presenting the cases against Sam's, Wal–Mart and Diamond Point. What Wells Fargo ultimately presented to the court, nevertheless, were legal bills totaling over $2,000,000; Wells Fargo sought payment of the fees, however, by arguing that Sam's and Wal–Mart, collectively, and Diamond Point were each responsible for fifty percent of those fees, without specifying which entities were responsible for what obligations. The trial judge found that such an allocation was inadequate in assisting her to properly apportion the proper and reasonable fees.

The judge remarked that she found that the hourly rates charged to Wells Fargo's counsel were indicative of counsel's level of expertise in the field and the "high level of skill ... required and necessary to present" Wells Fargo's case. She further found that the rates were reasonable and similar to rates of this region. The judge also concluded that some charges were peculiar, for instance, expenses for several attorneys and paralegals attending depositions, secretarial overtime, meals, faxes, trips and descriptions of legal services that were redacted from the bill. The court's ruling was an improper exercise of its discretion in light of the substantial judgment of approximately $23,000,000 awarded against Diamond Point, and an amount in excess of $1.3 million awarded against Sam's and Wal–Mart. The fee split down the middle, as suggested by Wells Fargo, however, was wholly incongruent.

Wells Fargo cites *Myers v. Kayhoe*, 391 Md. 188, 207–08, 892 A.2d 520 (2006), for the proposition that, because the pertinent lease and mortgage agreements executed by Sam's and Diamond Point, respectively, contained provisions for mandatory attorney's fees, the trial court's failure to award Wells Fargo fees that counsel documented constituted reversible error. In light of the court's discretion, the judge was within her authority not to render a piecemeal fee award against the cross-appellants when the party seeking the fees failed to specifically attribute the proper charges to the party responsible. The judge explained that she would have pre-

ferred a line-by-line accounting of the charges and should have asked for one. The court's statement was not intended to require a line-by-line accounting for each case that involves complex litigation and a request for attorney's fees. According to the trial judge, however, additional details should have been provided within the bills submitted by Wells Fargo. She concluded that it was "impossible" to calculate and fairly assess Wells Fargo's charges and expenditures to Sam's, Wal–Mart and Diamond Point under the circumstances. The court should have compelled Wells Fargo to resubmit the bills for which it sought payment with a clearer indication of exactly what those charges represented.

On remand, bearing in mind that the court has already discounted certain charges that it found not credible, Wells Fargo should itemize to the extent required by the court to enable the court to exercise its discretion as to allocation of charges proven to a certainty. *Maxima Corp.,* 100 Md.App. at 453, 641 A.2d 977. Wells Fargo, as the party seeking the fees, bears the burden of presenting evidence sufficient for the trial court to render a judgment as to their reasonableness. *Id.* Wells Fargo "must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged" for the trial court to consider allocating payment. *Id.* Without detailed records, the trial court's determination of the reasonableness of the fees is accomplished only by conjecture or opinion of Wells Fargo, and would thus not be supported by competent evidence. *Id.* at 454, 641 A.2d 977. Even after submission of the documentation of fees, the court must determine the submission's reasonableness according to the factors listed *supra.* *Id.*

We shall briefly address Sam's and Wal–Mart's sixth question concerning whether the court erred in granting summary judgment to Sam's and Wal–Mart and whether it was harmless. Sam's and Wal–Mart argue that, if we conclude that the court erred in granting summary judgment in their favor on the issue of attorney's fees pursuant to the lease, it was harmless inasmuch as Wells Fargo failed to meet its burden of attributing reasonable and necessary fees to the claims against

Sam's and Wal–Mart. We have concluded that the court erred as to attorneys fees to Wells Fargo; a harmless error analysis is unnecessary because the court will reconsider on remand the contentions of Wells Fargo and apply the factors stated *supra* in determining the proper awards of attorney's fees. Thus, Sam's and Wal–Mart's contentions as to the line-by-line analysis will be alleviated. The court will determine reasonable attorney's fees from records that substantially comply with the obligations stated *supra*.

## II

### Sam's and Wal–Mart's Cross–Appeal

Because we have addressed Sam's and Wal–Mart's first, fifth and sixth questions under section I, we turn to the second, third and fourth questions of their cross-appeal. Sam's and Wal–Mart, respectively, and as individual entities, dispute the court's rulings regarding the damage awards imposed by the court after finding that Sam's had violated the retail use restriction and the radius restriction. Wal–Mart also contends that, because it was "not a party to the subject lease or an express assignee of the lease," it could not be held liable for breaches of the lease to which Sam's, a separate entity, was a party. We disagree.

### a. Restriction Breaches and Damages

Subsection 8(A) of the Lease, titled "Use of Demised Premises and Shopping Center," states that Sam's, as the tenant, "shall not be required to operate any business within the demised premises, but if Tenant is open for business the demised premises shall only be used for lawful retail and shopping center purposes...." Subsequent to the Diamond Point Sam's store closing, Wal–Mart, listed as Licensor and holder of a "leasehold interest" in the former Diamond Point Sam's premises, entered into a Revocable License Agreement with The Wire Productions, Inc. (The Wire), permitting The Wire to occupy the premises for the following purposes:

(a) constructing sets for motion picture/television series, (b) photographing and recording scenes for motion picture/television series, (c) maintaining production offices and (d) creating a post production facility.

Wal–Mart retained the power to revoke the license if The Wire used the premises for any other purpose without obtaining permission from Wal–Mart. The Agreement, commenced on November 1, 2002, expired on October 31, 2003 and contained an option for The Wire to extend the Agreement for two one-year options. The Wire was a tenant, according to the court's Findings of Facts, from "November 2002 and continuing through April 2005."

Concerning the computation of damages resulting from less profits, we have previously explained that

> it is not necessary to show these amounts with absolute certainty.... Courts have modified the "certainty" rule into a more flexible one of "reasonable certainty." In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.

*GAI Audio of New York, Inc. v. Columbia Broadcasting Sys., Inc.,* 27 Md.App. 172, 200, 340 A.2d 736 (1975) (citation and quotation marks omitted).

■■■ At the outset, we address Sam's allegations that the court erred by using the incorrect standard and finding that the retail use restriction violation was not the proximate cause of $1.25 million in damages. We agree with Wells Fargo that Sam's misconstrues damages for breach of contract with the proof of damages required for a tort action. In a lead paint injury case, we reiterated that "[i]n general, a plaintiff may recover only those damages that are affirmatively proved with reasonable certainty to have resulted as the natural, proximate and direct effect of the tortious misconduct.... Where the conduct of a defendant was a substantial factor in bringing about the suffering of an injury, such conduct will be deemed to have caused the injury." *Bartholomee v. Casey,* 103 Md.

App. 34, 56, 651 A.2d 908 (1994) (citations and quotation marks omitted). Because Wells Fargo's case against Sam's and Wal-Mart was based upon breach of contract, the court was not required to use a proximate cause analysis to determine the relationship between Sam's and Wal-Mart's breach of the retail use provision and the damages suffered by Wells Fargo. There was thus no error insofar as the court's analysis was concerned.

■ The court found that The Wire's presence at the former Diamond Point Sam's Club store violated the retail use provision and held Sam's and Wal-Mart jointly and severally liable for $1.25 million in damages. There is credible record evidence from which the trial judge could draw inferences to support the finding of the breach and the $1.25 million judgment in damages against Sam's and Wal-Mart as a result of that breach.

The judge heard testimony from expert and lay witnesses, who testified to the harm suffered by Diamond Point as landlord and, in turn, Wells Fargo as Diamond Point's mortgage lender because the demised premises, previously held and occupied by one of the largest retailers for the Center, was now being used by an unauthorized tenant not involved in retail business. The trial judge specifically credited the expert testimony of William Thomas Baird, who was qualified as an expert in the field of management, leasing and marketing of commercial shopping centers; his testimony was noted as part of the court's Findings of Fact and Conclusions of Law. When questioned about his opinion concerning having a dark store in a shopping center contrasted with the presence of a non-retailer, Baird stated:

> Non-conforming use that is worse. The owner put in a non-retail use. The probability of my being able to participate in a vibrant center is diminished, even though other stores there with a lease, that is worse. But the worse that I have every [sic] seen, just about the worse I have ever seen is to have something like The Wire there presenting such an unattractive negative face to prospective tenants

and shoppers that a prospective tenant is going to hope to sell to.

Baird also believed that the fact that The Wire occupied the space "aggravate[d]" the rate of vacancy currently at Diamond Point Center.

Additionally, Neil Demchick, testifying as an expert for Wells Fargo, stated that, in his opinion, Diamond Point was "impair[ed]" by the retail use breach because The Wire's presence as a non-retail entity made Diamond Point's ability to relet the vacant spaces to prospective retailers difficult. Demchick opined that "The Wire in there is going to deter the desirability of any tenant to move into the Ames space." Because the space occupied by The Wire was not being utilized as retail space, he attested, it "was not attractive to people coming in to shop having a non-retail use in there."

Sam's experts also testified as to the manner of calculating damages, assuming the breach caused damages. They also countered Wells Fargo's experts, asserting that the dark Sam's location was just as damaging to Diamond Point's ability to relet the premises as having the space occupied by a non-retail entity. The trial judge, sitting as the trier of fact, weighed and balanced the credibility of each witness's testimony. The court's findings, extracted from the evidence before it, were not erroneous or unsupported. Patently, the testimony established reasonable certainty as to the cause of damages to Wells Fargo as a result of the retail use breach.

■ We also reject Sam's contention that the court's judgment requires reversal because the court amended its findings regarding damage to Diamond Point and the impact of the vacant Ames space. The court initially stated under ¶ 288 of the Factual Findings that it was "unable to find that the presence of The Wire has caused Diamond Point damage by effectively preventing the former Ames space from being relet based on the reletting of Ames vacant spaces in other shopping centers." After hearing and considering additional testimony with respect to the closing of several Ames locations within the area, the court amended ¶ 288, ruling that it was

"unable to find that the presence of The Wire has prevented the former Ames space from being relet based on the Ames vacant spaces in other shopping centers in the trade area." It is evident from the modification that the trial judge was convinced that the non-retail use permitted by Sam's and Wal–Mart damaged Diamond Point and Wells Fargo, regardless of whether the Ames space could be relet. There is no clear error in these findings, in our opinion, that would warrant reversal.

■■■ We similarly hold that the findings concerning damages assessed for Sam's breach of the radius restriction as a consequence of the opening of the Port Covington Sam's location, were not clearly erroneous, nor was the award of damages an abuse of the court's discretion. The Diamond Point Sam's Club store and Sam's Club store in Port Covington were located within a seven mile radius[3] during the months of May, June and July of 2002, when both stores were also open for business. After ruling that a breach of the provision had, in fact, occurred, the damages to Diamond Point and Wells Fargo were apparent; the calculation of the subject damages, however, was not as clear.

The court expressly rejected Wells Fargo's argument that the accurate measure of damages should have consisted of Sam's expected profits for the Port Covington Sam's Club, "measured by the gross sales there." Instead, the court ruled:

311. The sales at Port Covington could be treated as sales exceeding the percentage rent threshold in the Sam's Lease. Under Section 4(C) of the Sam's Lease, Sam's was required to pay 3/4% of all sales above $75 million, by reference to the formula provided in Section 4(C).

---

3. Sam's posits that, because the stores were separated by 6.875 miles and the Patapsco River, that the breach is not too significant, given the proximity to the seven mile restriction. We however, agree with the trial court following the letter of the law or, in this case, the language contained in the lease, which was not subject to any elasticity to accommodate another store location that *nearly* comported with the restriction.

312. Applying that formula, $56,260.86 would be due as percentage rents. The Court therefore makes the finding that the damages due Wells Fargo for Sam's breach of the Radius Restriction are $56,260.86.

(Exhibit references omitted.)

The court pointed to the comparison between the rents that would be due and owing under the lease had Sam's adhered to the radius restriction, as opposed to focusing on expected or scheduled profits. In light of the lease provisions and the relationship among the parties, we conclude that the court's measure of damages was proper and well within its discretion.

### b. Wal–Mart's Liability Under Sam's Lease

In its brief, Wal–Mart argues that, because Sam's is a "separate, validly formed and existing corporate entity who was the express assignee of the Makro lease" and it was not a party to the lease with Diamond Point, it should not have been held liable for breaching the retail use provision of the lease. The evidence before the court nevertheless properly persuaded the fact finder to conclude differently. The court referred to the subject lease, noting that Sam's, as tenant, was to remain "primarily liable" for any breaches of the lease and the damages resulting from a breach "notwithstanding any assignment." The court noted that, under section thirty-eight of the lease, Diamond Point should have received written notice of Wal–Mart's intent to assign the lease for the dark Sam's Club location to The Wire, and that the notice should have included "[the assignee's] intended use of the demised premises...." The section also provided that "no such use [by the assignee] may violate the provisions of [the Use Restriction] or any other provision of this lease...."

Neither Wal–Mart nor Sam's notified Diamond Point of the lease assignment. Additionally, inasmuch as Wal–Mart claims that it was not an express assignee under the lease,[4] its

---

4. Wal–Mart cites *Scott v. First Nat'l Bank,* 224 Md. 462, 468, 168 A.2d 349 (1961) and *Brooks v. Mitchell,* 163 Md. 1, 161 A. 261 (1932) for the proposition that gratuitous and constructive assignments, the type of

License Agreement with The Wire suggests otherwise, based upon the court's following factual findings, which were supported by the evidence:

258. Licensor is defined as Wal–Mart Stores, Inc., one of the defendants named in this lawsuit.

259. Under the terms of the License, The Wire is to pay and has paid Wal–Mart $53,157.75 per month in rent since November, 2002.

\* \* \*

263. In all, The Wire has been a tenant for 30 months. . . .

\* \* \*

268. Since at least January of 2003, shortly after Wal–Mart signed the License agreement with The Wire, Wal–Mart, not Sam's, has paid all monetary obligations under the Sam's Lease, including base rent, common area maintenance costs, taxes, and insurance.

269. Wal–Mart has collected $1,647,890.25 in rental payments from The Wire through May 2005.

(Exhibit references omitted).

The court also found that it was undisputed that

---

assignment it argues occurred here, are unenforceable in Maryland. Wal–Mart's reliance on these cases is misplaced in that in *Scott*, the Court of Appeals applied Connecticut law to rule on an assignment of one-half of an expectancy from an estate where there was no contract or document to enforce the assignment. In *Brooks*, 163 Md. at 3, 161 A. 261, the Court dealt with whether

> a gift *causa mortis* of a deposit in a savings bank can be effected by the mere delivery to the donee of the passbook issued by the bank to the donor as evidence of his title to the same, where the donor sufficiently indicates an intention of assigning or transferring the fund to the donee but executes no written order for the transfer or assignment thereof.

Wal–Mart's agreement, coupled with the authority it exercised in its dealings with The Wire after the subtenancy commenced, was sufficient to find that an assignment had occurred.

Sam Harper, who was responsible for signing up The Wire, is a Wal–Mart employee; he presented a proposal to the Wal–Mart Realty Committee which authorized The Wire as a subtenant; Wal–Mart signed the License as the licensor stating it held a leaseable interest in the premises; the letter amending the License agreement was signed by Wal–Mart; . . . .

(Exhibit references omitted.)

Based upon this credible evidence, we conclude, as did the trial court, that "Wal–Mart expressly assumed and has *exercised the obligations and accepted the benefits of a Tenant* under the Sam's Lease." (Emphasis added.) Accordingly, the court did not err in finding that both Sam's and Wal–Mart were tenants under the lease between Diamond Point and Sam's, resulting in both entities being jointly and severally liable for damages to Diamond Point and Wells Fargo.

## III

### Diamond Point's Cross–Appeal

Having considered the trial court's denial of attorney's fees to Wells Fargo, we now address Diamond Point's remaining questions. Diamond Point argues that all judgments against it should be reversed because of several erroneous findings by the court. Diamond Point asserts that it made no misrepresentations and, accordingly, Wells Fargo is not entitled to recourse liability. It also contends that it was entitled to keep the rents and that the court erred in finding that Michael Konover fraudulently converted the same. Diamond Point challenges the court's findings with respect to the court's determination that its actions constituted waste and its calculation of the respective awards of damages.

### a. Findings of Fraud, Misrepresentation and Gross Negligence

■ Diamond Point argues that the court committed reversible error in finding that Diamond Point committed fraud, gross negligence and that it misrepresented material informa-

tion to Pinnacle and Paine Webber, Wells Fargo's assignors, concerning the tenancy status of the Diamond Point Sam's Club location before the parties agreed to the refinancing loan. Diamond Point contends that no carve out recourse liability exists in that Diamond Point did not misrepresent any facts and that Wells Fargo was not injured as a result of any of the alleged misrepresentations. It also claims that it could not have been liable because neither Pinnacle nor Paine Webber relied on the alleged misrepresentations. We see it differently.

Under the Recourse Obligations section of the Amended and Restated Mortgage Security Agreement (Amended Mortgage), ¶ 55 provides, in pertinent part:

> ... The [non-recourse] provisions of this paragraph shall not ... (vi) constitute a waiver of the right of [Wells Fargo] to enforce the liability and obligation of [Diamond Point], by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by [Wells Fargo] (including attorneys' fees and costs reasonably included) arising out of or in connection with ...

> (A) fraud or intentional misrepresentation by [Diamond Point], or any Guarantor in connection with the Loan;

> (B) the gross negligence or willful misconduct of [Diamond Point]. . . .

Days prior to the closing on the subject refinancing loan for $15.3 million between Diamond Point and Pinnacle, Steven Abney, Executive Vice President of Diamond Point, signed the "Certificate of Borrower," where Diamond Point as Borrower affirmed that it knew

> of nothing involving the Loan, the Mortgage Property, [Diamond Point] or [Diamond Point's] credit standing that may reasonably be expected to (a) cause private institutional investors to regard the Loan as an unacceptable investment; (b) cause the Loan to become delinquent; or (c) adversely affect the Loan's value or marketability.

13. *No Change in Facts or Circumstances.* All information set forth in the application for the Loan submitted to [Pinnacle] . . . and in all financial statements, certificates and other documents submitted in connection with the Loan Application or in satisfaction of the terms of the Loan Commitment submitted to [Pinnacle], is accurate, complete and correct in all material respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete, incorrect, or otherwise misleading.

\* \* \*

21. *Leases.* . . . As of the date hereof, . . . (vii) except as otherwise provided in the rent roll, all Rents due and payable under each Lease have been paid in full and no said Rents have been paid more than one (1) month in advance of the due dates thereof; . . . (ix) *with respect to any commercial tenant of the Mortgaged Property, [Diamond Point] has no knowledge of any tenant's intention or notice to vacate the premises and/or cease the payment of rent thereon.*

\* \* \*

27. *Representations and Warranties True.* Each and every representation and warranty contained herein and which is within [ ] [Diamond Point's] reasonable control, will remain materially true and correct at all times from the date hereof until the Loan is repaid in full in accordance with its terms. In the event that any representation or warranty contained herein becomes untrue, in whole or in part, after the date hereof, [Diamond Point] will so advise [Pinnacle] in writing immediately.

(Emphasis added.) The loan between Pinnacle and Diamond Point closed on June 2, 2000, after Richard Liljedahl, a Senior Vice President for Diamond Point entity Konover Management Corporation, had signed the Borrower's Certificate and Consent, certifying that the statements and representations it

made in the Amended Mortgage and Certificate of Borrower were "accurate and complete."

The critical question before the trial court was what was discovered with respect to imminent vacancies, by whom and when? More specifically, did Diamond Point know that Sam's intended to vacate its space prior to signing the loan with Pinnacle and did it share that knowledge with Pinnacle? Despite its arguments to the contrary, the evidence demonstrates that Diamond Point had knowledge of this material fact and failed to disclose that information to its mortgage lender. *See Carozza v. Peacock Land Corp.*, 231 Md. 112, 121, 188 A.2d 917 (1963)(explaining "[i]n a business transaction, reliance upon a misrepresentation of fact, intentionally misrepresented or otherwise, is justifiable only if the fact misrepresented is material. *A fact is material if its existence or nonexistence is a matter to which a reasonable man would attach importance in determining his choice of action in the transaction, or the maker of the misrepresentation knows that its recipient is likely to regard the fact as important although a reasonable man would not so regard it."*)(emphasis added).

Liljedahl and Vice President of Konover Capital Advisors Susan Larkin,[5] on behalf of Diamond Point, contacted prospective lenders to arrange refinancing in the summer of 1999. Lehman Brothers Holdings Inc. (Lehman Brothers), a mortgage broker with whom Diamond Point entities had other loans, was one of the companies contacted. In August of 1999, Lehman Brothers had learned, after visiting the Wal–Mart website, of Wal–Mart's attempts to sublease the Sam's Club location at Diamond Point. Larkin testified that Lehman Brothers also contacted Wal–Mart about the information and

---

**5.** Of note, the trial judge made the following finding concerning the credibility of certain witnesses, stating:

> The Court finds the following witnesses were motivated to tell a story in a way that makes their version of the events unreliable: Sam Harper, Richard Liljedahl, Susan Larkin, James Ainsworth and Michael Konover. To the extent that the testimony of these witnesses conflicts with the testimony of other witnesses, the conflicting testimony of these witnesses is rejected.

was told by "someone" at Wal–Mart that "they were planning to close the store in November of 2000." Larkin expressed her concern upon receiving this news, stating that she contacted Liljedahl, Richard Cohen, head of her company's development group and several other executive-level personnel affiliated with Diamond Point by way of electronic mail.[6]

Subsequent to the denial of Diamond Point's application by other brokers, Diamond Point contacted Pinnacle. Although Diamond Point claims it conveyed the circumstances surrounding Sam's tenancy to Charles Chamberlin, an executive with Pinnacle, there is no credible evidence, as found by the trial court, to demonstrate that such an exchange took place.

 It is axiomatic that facts which are discovered that indicate that one of the anchor tenants of a shopping center may vacate are material to a commercial lender's decision to approve a loan. The evidence contained in the record does show, however, that several Diamond Point personnel knew of

---

6. During the trial, Larkin related the following:
 Q You sent it to Mike Goman. Who is Mike Goman?
 A CEO, I think.
 Q Of Konover Capital?
 A No. Of the whole organization.
 Q The whole organization. All of the Konover entities generally?
 A That may not be exactly his title but he was up there.
 Q A big-wig [sic]?
 A Yes.
 Q And Alan Smith, who is he?
 A Alan was also in our development group, a senior person in our development group.
 Q John Anderson, who was he?
 A Also a senior person in our development group.
 Q And Evelyn Ramira, who was she?
 A She was a leasing representative working for Konover Leasing, an in-house person who handled leases.
 Q And you sent the e-mail to Rick, your boss, right?
 A Yes.
 Q ... immediately after you sent it you decided there was another person you needed to send it to and that was Lawrence Merlin, is that right?
 A Yes
 Q And who is Lawrence Merlin?
 A He was our in-house counsel.

Sam's plans, regardless of whether they considered the rumored plans of Sam's to vacate the space mere speculation or a probability that Sam's would vacate the space. The knowledge of an agent is attributable to the principal. *See Duckworth v. Bernstein*, 55 Md.App. 710, 722, 466 A.2d 517, *cert. denied*, 298 Md. 243, 469 A.2d 452 (1983)(noting "[w]here an agent acquires knowledge in the course of his agency, and has no personal interest in the transaction adverse to the interest of the principal, the agent's knowledge is ascribed to the principal.") (citation omitted). Diamond Point knew of Sam's plans months before Pinnacle closed on the loan and agreed to assign the loan to Paine Webber for financing. Pinnacle, however, was never informed of these plans before the loan was consummated, nor was Paine Webber or its assignee, Wells Fargo, in clear violation of Diamond Point's guarantees under its Certificate of Borrower and Borrower's Certificate and Consent.

Diamond Point avers that there was no misrepresentation because the fact that Pinnacle's representative, Chamberlin, was informed of Sam's plans to vacate is a circumstance covered by the introductory language of the Certificate of Borrower, which states: "In addition to all other representations, warranties and covenants...." Having already rejected the argument that Chamberlin knew of Sam's plans, Diamond Point's assertion fails. We also reject Diamond Point's contention that, because the closing and relocation of the Sam's Club store were not approved until months after the parties closed on the loan, there was no misrepresentation. Paragraph twenty-one of the Certificate of Borrower required that Diamond Point certify that it had no knowledge, as of late May 2000, of "any tenant's intention or notice to vacate the premises...."

The final decision and action on Sam's part to relocate its store is certainly definitive, but were not the events which triggered the obligation imposed by the contract to put Pinnacle, as the lender, on notice of an imminent vacancy. The court discussed how the evidence revealed that Sam's plan to vacate was more than a rumor and had, in fact, been in the

company's plans since 1998. Even if Sam's plans were only a "rumor" when Diamond Point learned of the former's plan, the "rumor" conveyed Sam's intent to vacate the premises, a critical fact not disclosed to Pinnacle.

In addition, there is evidence that Diamond Point continued to uncover information about Sam's before closing on the loan in June of 2000. Larkin emailed Liljedahl that Richard Cohen, an employee of a Diamond Point affiliate, contacted Wal–Mart and was told by a Wal–Mart representative that Sam's planned to vacate the Diamond Point location within the next one to two years. As noted, neither the Lehman Brothers communication, nor this information, was forwarded to Pinnacle. Discrediting Diamond Point's characterization of Sam's plans as rumors and the February email as a "thin reed" upon which the court based its findings of misrepresentation is the fact that Diamond Point continued to investigate the information, which further demonstrates that Diamond Point was concerned about the status of Sam's tenancy at the Center, as one would also expect Pinnacle, had it been so informed.

■■■ Diamond Point claims that the court erred in finding that it withheld other material information from Pinnacle and Paine Webber, *i.e.*, the Center was placed on a Performance Improvement Plan in April of 2000 because 140,020 square feet was at risk, with notes speculating as to Sam's closing. In its brief, Diamond Point criticizes Wells Fargo for failing to present evidence that "knowledge of the Performance Improvement Plan would have caused Pinnacle not to make the loan or change any loan terms." The fact that the Center was on an improvement plan does not compel the conclusion that the finding is erroneous. As interesting as it may have been to Pinnacle, the court was focusing on why the Center was listed on the plan. The basis, for any reasonable fact finder, constitutes a material fact that should have been disclosed.

■■■ Diamond Point also challenges the court's finding that the Lehman Brothers' information on Wal–Mart listing the Sam's space for sublease and the decision of Lehman Brothers

to deny financing constituted material information. Lehman Brothers' denial was based on facts regarding Sam's status as an anchor tenant at the Center; patently, it was material to Lehman Brothers' evaluation of the refinancing application submitted by Diamond Point.

Finally, Diamond Point insists that the court should not have granted recourse liability to Wells Fargo because it did not prove that the damages it suffered arose from the carve outs under ¶ 55 concerning fraud and misrepresentation. We disagree.

The fact that Sam's planned to close was a fact material to the value and marketability of Pinnacle's refinance loan. The evidence demonstrates that this vital information was misrepresented and kept from Pinnacle and Paine Webber. In light of the fact that the record shows that at least two lenders would not refinance the loan because of uncertainty surrounding Sam's tenancy, it is telling that, during the months that Pinnacle and Diamond Point were negotiating, there was little public discussion about Sam's status at the Center until after the parties closed on the loan. Had Pinnacle and/or Paine Webber known or been apprised of Sam's planned departure from the Center, it is unlikely that Diamond Point would have approved the loan. Diamond Point's omissions and misrepresentations about its anchor tenant, Sam's, impaired the collateral for the $15.3 million obligation. The balance of the loan, plus the applicable interest computations, totaling $22,862,399.66, constitute the proper calculation of losses and damages suffered as a result of the misrepresentations and/or gross negligence in making its loan application. The court's award of damages resulting from carve out liability was proper.

### b. Collection of Wells Fargo Rent

According to Diamond Point, the court erred when it ruled that Wells Fargo was not required to demand rent from it and concluded that the amount of $633,000 represented rents that were to go to Wells Fargo. Diamond Point also posits that

the court committed error by finding that the funds were fraudulently transferred. We are persuaded by the unambiguous and plain meaning of the pertinent documents and the evidence before the court that it did not err.

Diamond Point's Assignment of Lease and Rents (Assignment) to Pinnacle, subsequently assigned to Paine Webber and Wells Fargo, provided:

1. *Present Assignment.* [Diamond Point as] Assignor does hereby and unconditionally assign to [Pinnacle] Assignee Assignor's right, title and interest in all current and future Leases and Rents it being intended by Assignor that this assignment constitutes a present, absolute and unconditional assignment and not an assignment for additional security only. . . . Assignee grants to Assignor a revocable license to operate and manage the Mortgaged Property and to collect the Rents. Assignor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt for use in the payment of such sums. *Upon an Event of Default (as defined in the Mortgage), the license granted to Assignor herein shall be automatically revoked by Assignee and Assignee shall immediately be entitled to receive and apply all Rents, whether or not Assignee enters upon and takes control of the Mortgaged Property. Assignee is hereby granted and assigned by Assignor the right, at its option, upon the revocation of the license granted herein to enter upon the Mortgaged Property . . . to collect the Rents.* Any Rents collected after the revocation of the license herein granted may be applied toward payment of the Debt in such priority and proportion as Assignee, in its discretion, shall deem proper.

(Emphasis added.)

Regarding events of default, the Amended Mortgage stated:

20. *Events of Default.* The Debt shall become immediately due and payable at the option of [Pinnacle] Mortgagee, without notice or demand, upon any one or more of the following events ("Events of Default"):

(a) If any portion of the Debt is not paid on or before the fifth (5th) day after the same is due;

(b) If any of the Taxes or Other Charges is not paid when the same is due and payable . . .

(c) If the Policies are not kept in full force and effect, or if the Policies are not delivered to Mortgagee upon request;

\* \* \*

(e) If any representation or warranty of [Diamond Point], or of any person guaranteeing payment of the Debt or any portion thereof or performance by [Diamond Point] of any of the terms of this Mortgage . . . made herein or in an [sic] such guaranty, or in any certificate, report, financial statement or other instrument or document furnished to Mortgagee shall have been false or misleading in any material respect when made; . . . .

"Rents" under the Assignment are defined as

. . . all accounts, deposits, rents, income, issues revenues, receipts, insurance proceeds and profits arising from the Leases and renewals thereof and together with all rents, income, issues and profits (including, but not limited to, all oil and gas or other mineral royalties and bonuses) from the use, enjoyment and occupancy of the Mortgaged Property, or the sale, lease, sublease, license, concession or other grant of right to use or occupy any portion thereof, vending machine proceeds, and any compensation received for the rendering of services by Assignor. . . .

 In its brief, Diamond Point cites cases and the Restatement (Third) of Property in support of its claim that Wells Fargo did not prove that it was entitled to any rents collected prior to November 22, 2002. The court's findings, based upon its interpretation of the clear language of the Amended Mortgage and Assignment suggest otherwise. Upon any event of default, which included failure to pay the mortgage timely or failure to pay taxes or making a false or misleading representation concerning any terms of the mortgage, the debt became "immediately due." Wells Fargo was

not required to notify or demand the debt once Diamond Point defaulted. Once the mortgage debt became due and payable upon default, pursuant to the Assignment, Wells Fargo was to receive "all Rents" and retained the right to enter onto the property to collect the rents. Given the unambiguous language in these documents, once the court, as rational finder of fact, found that Diamond Point defaulted by misrepresenting material facts at the inception of the mortgage, it properly made further findings and conclusions of law regarding Wells Fargo's entitlement to the rents. Moreover, the clear language of the documents leaves no room for interpretation or construction.

Diamond Point's argument concerning the incorrect calculation of rents due Wells Fargo also fails because the definition of "Rents," as listed in the Assignment, encompasses nearly all monies Diamond Point collected that arose from leases, lease renewals, subleases, and any other "income, issues ... and profits" it received from the "use, enjoyment and occupation" of the Center. Diamond Point employs the more restrictive, generic definition of "rent," which is inapplicable. Additionally, the date when Diamond Point received rents is irrelevant inasmuch as the critical date for purposes of when the rents became due and payable to Wells Fargo is the date of default. The evidence supports the court's finding that the default based on the mortgagor's misrepresentation occurred at the inception of the Mortgage, resulting in Wells Fargo's entitlement to all monies, in this case $633,000, that could be traced to "Rents" under the Assignment.

With respect to the court's finding of conversion,[7] it ruled that Diamond Point, specifically Michael Konover, violat-

---

7. We have previously explained:

Conversion has been defined as a distinct act of ownership or dominion exerted by a person over the personal property of another which either denies the other's rights or is inconsistent with it. "The gist of a conversion is not the acquisition of the property by the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled." Accordingly, a conversion

ed paragraph 55(F) of the Amended Mortgage, prohibiting the "misapplication or conversion" of "any Rents following an Event of Default." Diamond Point contends that the findings were erroneous because Wells Fargo failed to show sufficient evidence of the fraudulent transfer to Konover and because the $633,000 at issue was repaid to the original transferor. We disagree.

The trial judge described these financial transactions among the Diamond Point entities as being conducted "in such a way as to hide the true nature of the transaction and to deceive creditors, including Wells Fargo. Specifically, the transfer was fraudulently characterized in the financial records of Diamond Point as an 'advance.' " The court found that Diamond Point's "repayment" is suspicious because the funds that were partially repaid were "immediately distributed to the partners of Diamond Point as a partnership distribution and therefore did not remain an asset of Diamond Point." The record, which includes Diamond Point's general ledger and testimony discussing the transfer of funds, demonstrates sufficient evidence to support the court's findings.[8]

The court's prerogative to credit or discredit the testimony of witnesses at trial is paramount. The same holds true for deposition testimony from the Diamond Point property manager that the funds went to Konover personally. The court found that the manager's testimony was corroborated by the ledger entry that showed the funds payable to him personally, and not transferred to MCK, Inc. Testimony found by the

---

occurs at such time as a person is deprived of property which he is entitled to possess.
*Parker v. Kowalsky & Hirschhorn, P.A.,* 124 Md.App. 447, 459, 722 A.2d 441 (1999).

8. In response to Diamond Point's assertion in its brief in a footnote that the court's judgment against American Way Commercial Associates Limited Partnership (American Way), for fraudulently receiving transferred funds should be reversed because it was not listed as a defendant in Wells Fargo's Third Amended Complaint, we are constrained to address the argument. The docket entries clearly reflect that American Way was added, by Consent Motion and Order, as a defendant, entered by the clerk of the court on May 5, 2005.

court to be credible, was further corroborated by objective, documentary proof. Consequently, the court did not err.

### c. Diamond Point's Commission of Waste

Diamond Point contends that the $1.4 million judgment against it for waste in failing to maintain and repair roofs at the Center and failing to properly enforce the terms of Sam's lease should be reversed. The record evidence, in our view, supports the court's rulings regarding waste and the damage it caused Wells Fargo.

We recently iterated what actions constitute waste:

A mortgagor's liability for waste "is in the nature of a tort" and is based upon "a breach of a duty arising from the mortgage relationship." Restatement (Third) of Property: Mortgages § 4.6 cmt. a, at 264 (1996). *See also* 93 C.J.S. Waste § 2 (1956) (stating that "the essence of liability for permissive waste is negligence."). There are principally two different types of waste: voluntary and permissive waste. Permissive waste, which is the type of waste at issue here, "involves acts of omission rather than commission," *Coutant*, 86 Md.App. [581], 596, 587 A.2d 1125 [1991], and "results generally from the failure of the possessor to exercise the care of a reasonable person to preserve and protect the estate for future interests." Powell § 56.05[2] at 56–19. Voluntary waste "is active or positive, and consists in doing some act of destruction or devastation, such as the pulling down of a house, or the removal of parts fixed to, and constituting a material part of, the freehold." 93 C.J.S. Waste § 1 (1956). Traditionally, waste involves physical damage to real property. Restatement (Third) of Property: Mortgages § 4.6 cmt. a, at 263 (1996).... The law of waste ... has also been applied to a narrow range of cases, which do not involve physical damage to real property but do involve the impairment of a mortgagee's interest in that property.

*Boucher Inv., L.P. v. Annapolis–West Ltd. P'ship*, 141 Md. App. 1, 18–19, 784 A.2d 39 (2001).

■ At the outset, the court's finding that it committed waste was erroneous in part because, according to Diamond Point, the Amended Mortgage requires that it should have been notified of its default and given an opportunity to cure the alleged breach of the waste provision. Diamond Point appears to conflate the provisions that allow for acceleration of the mortgage debt in the event of default and the violations listed under the recourse obligations of the Amended Mortgage. Under ¶ 8, titled "Maintenance of Mortgaged Property," Diamond Point's responsibilities to maintain the Center in good condition and conducting repairs when necessary are set forth. Paragraph 20(k) governs the timetable Diamond Point was to follow upon receiving a notice of default from Wells Fargo and the proper procedure in attempting to cure that default. Under the Amended Mortgage, waste is not considered an event of default but rather, is one of the listed violations of ¶ 55(a)(vi)(E) by which Wells Fargo had the right to

> enforce the liability and obligation of [Diamond Point], by money judgment or otherwise, to the extent of any loss, damage, cost, expense, liability, claim or other obligation incurred by [Wells Fargo] . . . in connection with . . . the committing of any waste on the Mortgaged Property by [Diamond Point] or any affiliate, agent, or employee of [Diamond Point].

Wells Fargo's right to enforce liability and the obligation of Diamond Point as a result of waste simply do not impose upon Wells Fargo a duty to notify Diamond Point and afford it an opportunity to cure waste, a condition it allowed to actualize.

■ Diamond Point cites a North Dakota case, *Vogel v. Pardon, et al.*, 444 N.W.2d 348 (N.D.1989), and our decision in a divorce proceeding, *Coutant v. Coutant*, 86 Md.App. 581, 595, 587 A.2d 1125 (1991), for the proposition that the only damages it should be liable for, assuming that it is responsible for waste, are the actual damages to the property as a result of waste, not any expenses to repair or replace the property. The North Dakota Court's holding in *Vogel*, in our opinion, does not buttress Diamond Point's argument because there,

the court affirmed the lower court's refusal to find that Pardon and other appellees did not commit waste; although there was water damage due to the leaking roof, "the roof had simply reached the end of its useful life through ordinary wear and age...." *Vogel,* 444 N.W.2d at 350. Because the record supported the finding that the roof had reached the end of its useful life due to time and "not through any act or omission of the [appellees]," the court's finding was not clearly erroneous and the appellants therefore were not entitled to receive *"damages for the replacement of the roof* itself." *Id.* (emphasis added).

Here, the court heard testimony from commercial roofing maintenance experts, testifying on behalf of Diamond Point and Wells Fargo, and reviewed the roofing records, which revealed a lack of consistent, reasonable repairs, inspection and maintenance to the roofs of the Center stores, particularly the vacant Ames store, the former Sam's Club store roof and the strip center's roof. This neglect, as discussed by both experts, prompted their opinions that Diamond Point's failure to maintain the roofs shortened the useful lives of the roofs. The court found that the roofing records demonstrated what Wells Fargo's expert opined: that "nearly all work performed on Diamond Point's roofs relate to leak repairs, but not recommended and required preventative maintenance." Additionally, Diamond Point's expert stated his conclusion that failure to regularly maintain and inspect a roof "would constitute waste." As a result, the court found that Diamond Point had "failed to perform reasonable preventative maintenance work, thereby reducing the useful life of the roof, and constituting waste...." The court concluded that Diamond Point violated one of the carve out provisions of ¶ 55 and, more generally, failed to abide by the ¶ 8 provisions, which resulted in the triggering of personal liability.

It is clear that *Vogel* is distinguishable from the case at bar because the court did not rule that the Diamond Point roofs were damaged because of the passage of time, but rather because Diamond Point did not properly maintain and prevent roofing problems. The Supreme Court of North Dakota

concluded that it would not award roof replacement costs to appellants because appellants would have been unjustly enriched with an award of replacement costs where the damage did not constitute waste. The court, in this case, specifically found that the damage and waste were caused by the nearly non-existent maintenance of the Diamond Point roofs. Thus, the actual damages, as referenced in *Coutant, supra,* due to Wells Fargo's neglect, should consist of the costs to replace and repair the roofs that Diamond Point failed to maintain.

The court considered three repair estimates from Diamond Point's expert—$646,000, $1.4 million and $2.1 million—and in a proper exercise of its discretion, concluded that the $1.4 million amount most accurately reflected the damages to Wells Fargo. The court's finding that the condition of the property was the result of waste and its calculation of damages were appropriate.

 Diamond Point also challenges the court's finding that its failure to enforce the radius restriction of Sam's lease regarding the Port Covington location constituted waste under the carve out provisions of ¶ 55 and by violating ¶ 7. Paragraph 7(b) requires:

> All Leases shall provide that they are subordinate to this Mortgage and that the lessee agrees to attorn to [Wells Fargo]. [Diamond Point] (i) *shall observe and perform all the obligations imposed upon the lessor under the Leases and shall not do or permit to be done anything to impair the value of the Leases* as security for the Debt; ... (iii) shall enforce all of the terms, covenants and conditions contained in the Leases upon the part of the lessee thereunder to be observed or performed, short of termination thereof; ....

(Emphasis added).

The court found that Diamond Point's failure to enforce the radius restriction, permitting the Port Covington store to serve customers while the Diamond Point Sam's store was still open, resulted in a decrease in gross sales for the Diamond Point location from "$3,905,988 in May to $3,641,979 in July

[2002]," while the gross sales at the Port Covington store for the same three month period totaled over $7.5 million. The court also accorded great weight to the fact that Konover Construction, a company "solely owned by Michael Konover," accepted the bid and contracted to construct the Sam's location at Port Covington for $7.59 million on August of 2001. We recognize that there was broad language employed in ¶ 7, requiring Diamond Point not to do "anything to impair the value" of the leases, but based upon this record, we perceive no error in the court's finding that Diamond Point's failure to enforce, in conjunction with the building of a competing store within the restricted radius by Diamond Point, impaired the value of the leases, which adversely affected Diamond Point's bottom-line and led to damages suffered by Wells Fargo.

### d. Calculation of Damages Against Diamond Point

 The court, according to Diamond Point, also erroneously calculated the judgment amounts for the damages because the court failed to utilize the correct interest computation to determine the proper interest on the judgment total of $1,859,675.30 and, additionally, that damages should not have been awarded when Wells Fargo made no efforts to mitigate its damages through timely foreclosure proceedings. These arguments are without merit.

Paragraph Twenty–One of the Amended Mortgage provides, in pertinent part:

21. *Default Interest.* Upon the occurrence of any Event of Default, [Diamond Point] shall pay interest on the unpaid principal balance of the Note at the rate of the greater of (i) 5% above the Applicable Interest Rate or (ii) 5% above the Base Rate ... in effect at the time of the occurrence of the Event of Default (the *"Default Rate"*). The term *"Base Rate"* shall mean the annual rate announced by Citibank, N.A., in New York City, New York as its base rate in effect at the time of the occurrence of the Event of Default. *The Default Rate shall be computed from the occurrence of the Event of Default until the actual receipt and collection of*

*the Debt. This charge shall be added to the Debt, and shall be deemed secured by this Mortgage....*

(Emphasis added.)

The court calculated the default interest rate on the outstanding principal balance of $15,031,132.84, which amounted to an additional five percent above the Applicable Rate of "8.89%." As noted, the evidence demonstrated that Diamond Point defaulted under the default provision in the Amended Mortgage by making false misrepresentations of material facts and failing to remit the November 2002 payment to Wells Fargo. Because the default interest, as the plain language provides, applies in the event of default, the interest could be applied at the point of the inception of the loan, after the fraudulent misrepresentation, and when Diamond Point missed its payment, both assessments made by the court. The court properly interpreted and applied the default rate in determining the interest owed in light of Diamond Point's events of default. The court did not err.

 We are similarly not persuaded that we should reverse the award of damages based on Diamond Point's assertion that Wells Fargo failed to mitigate its damages and delayed foreclosing on the property. Diamond Point cites a portion of a sentence in a prior decision for the proposition that, because Wells Fargo failed to make reasonable efforts to mitigate its losses, it was not entitled to damages. The sentence, read in context, does not support Diamond Point's claim. The Court of Appeals has explained that,

> where one party to a contract commits a breach of contract, the other party is required by the "avoidable consequences" rule of damages to make all reasonable efforts to minimize the loss he sustains as a result of the breach, and he can charge the party in default with such damages only as, with reasonable endeavors and expense and without risk of additional substantial loss or injury, he could not prevent.... "(T)he burden of proving that losses could have been avoided by reasonable effort and expense is upon the party who broke the contract."

*Sergeant Co. v. Pickett,* 285 Md. 186, 203, 401 A.2d 651 (1979) (citation omitted).

Assuming, without deciding, that Wells Fargo was required to mitigate its damages, according to *Sergeant,* it was Diamond Point's burden to prove that Wells Fargo could have avoided all the losses it claimed "by reasonable effort and expense without risk of additional loss or injury." *Id.* at 204, 401 A.2d 651. Diamond Point argued in its brief that, although "Wells Fargo was not required to take action that would have caused risk of additional loss, . . . Wells Fargo presented no evidence that foreclosing on the property prior to trial in April 2005 presented any such risk." This argument and the support offered by Diamond Point are insufficient to sustain its burden. Diamond Point merely demonstrated that Wells Fargo considered its options and pursued its remedies as and when it saw fit to do so, under ¶ 26 of the Amended Mortgage. Wells Fargo could have pursued any of the options, which included declaring the entire balance immediately due or initiating partial or complete foreclosure proceedings on the property, "concurrently or otherwise, at such time and in such order as [Wells Fargo] may determine, *in its sole discretion,* without impairing or otherwise affecting the other rights and remedies. . . ." (Emphasis added.) Diamond Point's assertions certainly do not set forth a cognizable basis for reversing Wells Fargo's award for damages simply because Wells Fargo did not act timely enough to suit Diamond Point's needs as the mortgagor under the defaulted mortgage.

Diamond Point also refers to our decision in *Mattvidi Assocs. Ltd. P'ship v. NationsBank of Virginia,* 100 Md.App. 71, 89, 639 A.2d 228, *cert. denied,* 336 Md. 277, 647 A.2d 1216 (1994), another case that is inapposite. In *Mattvidi,* like Diamond Point here, appellant borrowers contended that, because appellee bank failed to institute foreclosure proceedings soon after the note defaulted, the court erred by not finding appellee failed to mitigate its damages. *Id.* We pointed to the fact that appellant borrower did not cite "any case from any jurisdiction in which any court has held that a lender in the bank's circumstances must foreclose on a loan in order

to mitigate its damages." *Id.* We also reiterated that "a plaintiff has no duty to take any action to mitigate its damages if that action causes the 'risk of additional loss or injury.' " *Id.* As a result, we held that the court's finding that appellant had not met its burden to prove appellee's failure to mitigate was not clearly erroneous. *Id.*

Without Diamond Point's citing any law or other authority to support a finding that Wells Fargo's damages should be recalculated because it "delayed" initiating foreclosure proceedings, we reject Diamond Point's argument. We perceive no error in the court's damage calculations.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART, VACATED AND REMANDED IN PART. COURT TO CONDUCT FURTHER PROCEEDINGS ON RADIUS RESTRICTION ERRONEOUSLY RESOLVED BY WAY OF SUMMARY JUDGMENT.**

**COSTS TO BE PAID ONE–THIRD BY WELLS FARGO, ONE–THIRD BY SAM'S AND WAL–MART, AND ONE–THIRD BY DIAMOND POINT ENTITIES.**